# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



APR 2 8 2017

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
|  | ) Case No. 1:17-SW-212 |
| Samsung Galaxy Note 4, Model SM-N910T IMEI #356095/06/390745/5 | ) |
|  | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1) and 846 | Conspiracy to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance |

The application is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by SAUSA Lena Munasifi

_____
*Applicant's signature*

Special Agent Ray Walker
*Printed name and title*

Sworn to before me and signed in my presence.

/s/

Theresa Carroll Buchanan
United States Magistrate Judge

Date: 4/28/17

_____
*Judge's signature*

City and state: Alexandria, Virginia

Honorable Theresa C. Buchanan
*Printed name and title*

## ATTACHMENT A

The property to be searched is a Samsung Galaxy Note 4, Model SM-N910T cellular phone, IMEI #356095/06/390745/5 (hereinafter "the Device"). The Device is currently located in a DEA evidence locker at 6715 Little River Turnpike, Annandale, Virginia.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.    All records on the Device, described in Attachment A, that relate to violations of the Federal Criminal Code involving controlled substances and Alvaro Saul VIGIL LARIOS ("VIGIL LARIOS"), including:

      a.  any conversations, whether through text messages or other applications, where VIGIL LARIOS discusses cocaine or any other controlled substance;

      b.  lists of customers and related identifying information;

      c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      e.  any information recording VIGIL LARIOS' schedule to the date the Device came into law enforcement possession;

      f.  any photographs of controlled substances; and

      g.  all bank records, checks, credit card bills, account information, and other financial records.

      h.  records of Internet Protocol addresses used; and

      i.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage and any photographic form.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



IN THE MATTER OF THE SEARCH OF

Samsung Galaxy Note 4, Model SM-N910T
IMEI #356095/06/390745/5

CURRENTLY LOCATED AT
DEA Evidence Locker
6715 Little River Turnpike,
Annandale, Virginia 22003

No. 1:17-SW-212

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Raymond Walker, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of property—an electronic

device—which is currently in law enforcement possession, and the extraction from that property

of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), and

have been since 1999. I am currently assigned to the High Intensity Drug Trafficking Area Task

Force, Washington Division (Group 12), which is located in Annandale, Virginia.  I have

participated in numerous narcotic investigations resulting in the arrest and conviction of drug

traffickers, and the seizure of controlled and dangerous substances.  These investigations have

involved the distribution and use of cocaine and other narcotics. I have received extensive training

in drug identification, drug distribution methods, and drug enforcement techniques.  As a result, I

am familiar with the use, effects, distribution techniques, appearance, and method of manufacture

and distribution of controlled substances.

3.     Through my training and experience, I am familiar with the habits and methods utilized by traffickers and abusers of controlled dangerous substances. Based upon this experience, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug trafficking. During the course of my participation in investigations of drug trafficking organizations, I have testified in trial proceedings and probable cause and detention hearings. As a Special Agent with the DEA, I have gained knowledge in the use of various investigative techniques, including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants, cooperating witnesses, the controlled purchase of narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Administrative and Grand Jury Subpoenas, and the execution of search and arrest warrants.

4.     I know that it is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators. I know that individuals engaging in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and in direct telephone conversations.

5.     I know that it is common for narcotics traffickers to utilize multiple mobile telephones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Additionally, I am aware that narcotics traffickers utilize

fictitious names, vehicles, and real property to circumvent law enforcement. I know that "smart" phones play an integral role in the daily lives of individuals engaging in the distribution of controlled substances and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations.

6.  The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal, state and local law enforcement officers, and information obtained from interviews and analysis of reports.

7.  This affidavit contains information necessary to support probable cause for the requested warrant. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.  The property to be searched is a Samsung Galaxy Note 4, Model SM-N910T, IMEI #356095/06/390745/5 (hereinafter referred to as "the Device"). The Device is currently located in a DEA evidence locker at 6715 Little River Turnpike, Annandale, Virginia 22003, within the Eastern District of Virginia.

9.  The applied-for warrant would authorize a forensic examination of the Device for the purpose of identifying electronically stored data specifically described in Attachment B.

## PROBABLE CAUSE

A.  Current Charge Against Alvaro Saul VIGIL LARIOS

10.  On February 23, 2017, Alvaro Saul VIGIL LARIOS (hereinafter "VIGIL LARIOS") was arrested, along with co-conspirator Francis Flores Salvador (hereinafter

"Flores"). On February 24, 2017, a criminal complaint was issued by United States Magistrate Judge Michael S. Nachmanoff and VIGIL LARIOS and Flores made their initial appearance. On February 28, 2017, at a combined preliminary and detention hearing, United States Magistrate Judge Ivan D. Davis found the criminal complaint was supported by probable cause and detained both VIGIL LARIOS and Flores.

11.     On March 22, 2017, Flores entered a plea of guilty to a criminal information charging him with conspiracy to distribute 500 grams or more of cocaine, in violation of Title 21 United States Code Sections 841(a)(1) and 846, in front of United States District Judge Liam O'Grady.

12.     On March 23, 2017, a Grand Jury indicted Alvaro Saul VIGIL LARIOS with conspiracy to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (1:17-CR-60). VIGIL LARIOS' trial is scheduled to begin June 28, 2017.

13.     The Device was seized from VIGIL LARIOS after his arrest on February 23, 2017. The Device has been in the possession of the DEA since it was seized.

B.      Background Investigation of VIGIL LARIOS' Conspiracy Charge

14.     In July of 2016, law enforcement began investigating a cocaine distributor, Francis Flores Salvador, in Arlington, Virginia, located within the Eastern District of Virginia. During the course of the investigation, law enforcement used a cooperating source ("CS-1") in a controlled purchase of approximately one ounce of cocaine from Flores in Arlington, Virginia. Through debriefings with CS-1 and recorded conversations between CS-1 and Flores, investigators learned that that Flores sold large quantities of cocaine and that he was looking for

4

a cocaine source of supply.

15.     In December of 2016, DEA agents set up a meeting with Flores that involved CS-1 and a second cooperating source ("CS-2"). Flores arrived at the meeting and discussed purchasing multiple kilograms of cocaine from CS-2. Flores agreed to meet CS-2 at a later date to further discuss the pending drug transaction.[1]

16.     In January of 2017, surveillance was conducted of a meeting involving Flores, CS-2, and a law enforcement officer acting in an undercover capacity (hereinafter "UC"). The meeting occurred in Alexandria, Virginia, within the Eastern District of Virginia. During the meeting, Flores was shown five kilograms of cocaine by the UC. Flores spoke to CS-2 about multiple customers who purchased cocaine from Flores and also made reference to an additional drug associate who had been arrested and deported based on cocaine related charges.

17.     On February 23, 2017, Flores traveled from Takoma Park, Maryland to 400 South Pickett Street, Alexandria, Virginia, within the Eastern District of Virginia, where Flores again met CS-2 and the UC to conduct a drug transaction involving one kilogram of cocaine.

18.     Once at the meet location, Flores explained to CS-2 that an associate of his, later identified as Alvaro Saul VIGIL LARIOS, was about to drive up to the location of the UC vehicle. Flores instructed CS-2 to place the container of cocaine in VIGIL LARIOS' vehicle

---

[1] When possible, statements made by CS-1 and CS-2 have been corroborated through various investigative techniques, including monitored telephone intercepts and surveillance. To my knowledge, CS-1 and CS-2 have never provided law enforcement with false or misleading statements. Both CS-1 and CS-2 have agreed to cooperate in the instant case in exchange for monetary payments. CS-2 has also agreed to assist the government in exchange for immigration considerations. CS-2 has no criminal record. CS-1 has a felony conviction for hit & run, in violation of Code of Virginia 46.2-894; felony conviction for intentional damage to property over $1,000, in violation of Code of Virginia 18.2-137; felony conviction for assault on law enforcement officer, in violation of Code of Virginia 18.2-57; felony conviction for a probation violation; and misdemeanor conviction for reckless driving, in violation of Code of Virginia code 46.2-852.

once it arrived. A short time later VIGIL LARIOS was observed driving a Nissan minivan through the parking lot to the location of the UC vehicle. VIGIL LARIOS came to a stop and CS-2 placed the container of cocaine in the rear hatch area of VIGIL LARIOS' vehicle. Flores and VIGIL LARIOS were subsequently arrested.

19.     Flores made statements to law enforcement regarding VIGIL LARIOS' involvement in the conspiracy. Flores stated that he had a prior conversation with VIGIL LARIOS the day before about Flores' intentions of traveling to Virginia to obtain cocaine. Flores stated that VIGIL LARIOS volunteered to travel to Virginia to facilitate the cocaine transaction and that VIGIL LARIOS agreed to accept a $300 payment to do so.

20.     Flores gave law enforcement consent to search his cellular phone. A review of the telephone's log records revealed multiple contacts with the Device under the heading "Steven Body Chop," telephone number 240-714-6208. The phone logs revealed multiple telephone communications between Flores and VIGIL LARIOS leading up to the cocaine transaction. FLORES stated to law enforcement that the number belonged to VIGIL LARIOS.

21.     In February 2017, law enforcement reviewed the text message application of Flores' cell phone and retrieved multiple text message communications between Flores and VIGIL LARIOS. The messages were written in Spanish and translated with the help of a Spanish speaking agent. On February 23, 2017, Flores communicated the following text messages with the Device:

6

| 2685 | +12407146208 | * Steven Body Chop | 23/02/2017 14:26:35 (GMT) | Sent | Sent | Phone | Outgoing | Mira este n me ha mandado la dirección espera q te diga para q te vengas | Look, this guy has not sent me the address, wait for me to tell you so you can come. |
|---|---|---|---|---|---|---|---|---|---|
| 2686 | +12407146208 | * Steven Body Chop | 23/02/2017 14:27:08 (GMT) | Read | Inbox | Phone | Incoming | Ok | Ok |
| 2687 | +12407146208 | * Steven Body Chop | 23/02/2017 14:27:25 (GMT) | Read | Inbox | Phone | Incoming | Avísame entonces aquí esperare en la casa | Let me know, so I'll wait here at the house. |
| 2688 | +12407146208 | * Steven Body Chop | 23/02/2017 14:27:38 (GMT) | Sent | Sent | Phone | Outgoing | Ok | Ok |
| 2690 | +12407146208 | * Steven Body Chop | 23/02/2017 16:01:46 (GMT) | Read | Inbox | Phone | Incoming | No hay nada todavia | There's nothing yet? |
| 2692 | +12407146208 | * Steven Body Chop | 23/02/2017 19:09:07 (GMT) | Sent | Sent | Phone | Outgoing | Ey | Hey |
| 2693 | +12407146208 | * Steven Body Chop | 23/02/2017 19:09:10 (GMT) | Sent | Sent | Phone | Outgoing | Caete | C'mon |
| 2694 | +12407146208 | * Steven Body Chop | 23/02/2017 19:09:12 (GMT) | Sent | Sent | Phone | Outgoing | Vamos | Let's go |
| 2695 | +12407146208 | * Steven Body Chop | 23/02/2017 19:10:08 (GMT) | Read | Inbox | Phone | Incoming | Ok me alistó estoy en el taller | Ok I'm getting ready, I'm at the shop |
| 2696 | +12407146208 | * Steven Body Chop | 23/02/2017 19:47:23 (GMT) | Read | Inbox | Phone | Incoming | Dónde estas | Where are you? |
| 2697 | +12407146208 | * Steven Body Chop | 23/02/2017 19:47:54 (GMT) | Sent | Sent | Phone | Outgoing | Ya pasó | It already happened |
| 2698 | +12407146208 | * Steven Body Chop | 23/02/2017 20:03:56 (GMT) | Sent | Sent | Phone | Outgoing | 400 s pickett st Alexandria va 22304 | 400 S Pickett St Alexandria, VA |

C.    VIGIL LARIOS' Arrest and Seizure of the Device

22.    VIGIL LARIOS was in possession of the Device at the time of his arrest and claimed ownership of the telephone but refused to cooperate with law enforcement. In February 2017, a subpoena was sent to T-Mobile USA, the cellular provider for the Device, requesting customer and subscriber information. The return information revealed a default address for T-Mobile USA with no additional subscriber information.

23.    In April 2017, a subpoena was sent to T-Mobile USA, requesting toll information for the cellular phone used by Flores. The toll information revealed approximately 225 contacts with the Device during the month of February 2017, 31 of which occurred on February 22, 2017 (the day the cocaine transaction was discussed between Flores and VIGIL LARIOS) and February 23, 2017 (the date of the cocaine transaction and arrest).

24.    The Device is currently in the lawful possession of the DEA. The Device came into the DEA's possession in the following way: On February 23, 2017, the Device was seized subsequent to a probable cause arrest of VIGIL LARIOS in Alexandria, Virginia. As of now the DEA does not have the necessary authority to examine the Device. I seek this warrant out of an abundance of caution to be certain that an examination of the Device will comply with Fourth Amendment and other applicable laws.

25.    The Device is currently in storage at the DEA Annandale, Virginia office. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

8

## USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG TRAFFICKERS

26. Based on my training, experience, and participation in narcotic and drug-related investigations, and my knowledge of this case, I know that:

> a. It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

> b. Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

> c. Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations. It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

> d. Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

Indeed, as described above, Flores coordinated drug transactions with VIGIL LARIOS through telephonic contact.

27. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f.  *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at www.samsunggalaxynote4specs-go, I know that the Devices could have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

13

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who

used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Raymond Walker
Special Agent
Drug Enforcement Administration

15

Subscribed and sworn to before me on this 28th day of April, 2017:

_____
                    /s/
          Theresa Carroll Buchanan
          United States Magistrate Judge
_____
The Honorable Theresa C. Buchanan
United States Magistrate Judge

16

**ATTACHMENT A**

The property to be searched is a Samsung Galaxy Note 4, Model SM-N910T cellular phone, IMEI #356095/06/390745/5 (hereinafter "the Device"). The Device is currently located in a DEA evidence locker at 6715 Little River Turnpike, Annandale, Virginia.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.    All records on the Device, described in Attachment A, that relate to violations of the Federal Criminal Code involving controlled substances and Alvaro Saul VIGIL LARIOS ("VIGIL LARIOS"), including:

    a.  any conversations, whether through text messages or other applications, where VIGIL LARIOS discusses cocaine or any other controlled substance;

    b.  lists of customers and related identifying information;

    c.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    e.  any information recording VIGIL LARIOS' schedule to the date the Device came into law enforcement possession;

    f.  any photographs of controlled substances; and

    g.  all bank records, checks, credit card bills, account information, and other financial records.

    h.  records of Internet Protocol addresses used; and

    i.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage and any photographic form.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.